UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 15 -14010-CR-MARTINEZ/LYNCH

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

JAY FREDRICK NAGEL,

                Defendant.
_____/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S REQUEST FOR DOWNWARD VARIANCE (DE 44)**

The United States of America, through the undersigned Special Assistant United States Attorney, files this response in opposition to defendant Jay Nagel's Request for Variance and states the following:

**I. Introduction**

On May 1, 2015, the defendant entered a plea of guilty to three counts of persuading, inducing, enticing, or coercing a minor to engage in illegal sexual activity, in violation of 18 U.S.C. §2422(b). The defendant's plea agreement did not contain any promises by the government for any particular sentencing recommendation. (DE 32) The offenses committed by the defendant are punishable by a minimum mandatory sentence of ten years in prison, up to a maximum statutory sentence of life. 18 U.S.C. §2422(b). The Presentence Investigation Report prepared by the United States Probation Office determined that the defendant's total offense level was 39, with an advisory guidelines sentencing range of 292-365 months. (DE 41)

## II. The Advisory Guidelines Range is Reasonable for This Defendant

The advisory guidelines range is reasonable for this defendant, considering the sentencing factors outlined in 18 U.S.C. §3553. The defendant's case in no way falls outside the heartland of cases involving similar offenses. In fact, this defendant's behavior was particularly egregious – he created a fictional identity to specifically target girls as young as 12 years old. He preyed upon their vulnerabilities and evinced what could fairly be described as a pathological patience in grooming his victims to gain their trust. He wasn't content, however, with one conquest of an underaged victim. After his first success he redoubled his efforts and over the ensuing months increased his take to four girls, ages 12, 13, 15, and 16. By the time he was detected by law enforcement, he was using his on-line alias to communicate with over twenty female minors. The defendant's request for downward variance must be denied.

### A. The Role of the Sentencing Guidelines

The Government recognizes that the Guidelines sentencing ranges are no longer presumed reasonable, just as guidelines variances are not presumed unreasonable. Nevertheless, the Supreme Court has recognized that the Guidelines "should be the starting point and the initial benchmark" for choosing a defendant's sentence. *Gall v. United States,* 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); *see generally United States v. Booker,* 543 U.S. 220, 246–58, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (striking down the mandatory guidelines regime on Sixth Amendment grounds, not on grounds of disagreement with the policies animating the guidelines regime)."

The Sentencing Reform Act (SRA) was motivated by a desire on the part of Congress to establish a rational sentencing system to provide for certainty, uniformity, and proportionality in criminal sentencing. The intent of Congress was to eliminate an unjustifiably wide range of

sentences imposed on offenders with similar histories, convicted of similar crimes, committed under similar circumstances and to recognize differences between offenses. S. Rep. No. 98-225, at 38 (1983). One goal was ensure that sentences available for different crimes reflected the seriousness of these crimes because "[s]entences that are disproportionate to the seriousness of the offense create a disrespect for the law." *Id*. at 45.

The SRA sets forth several substantive requirements that have guided the Sentencing Commission's actions in the area of child exploitation offenses, as with all federal offenses. In prefatory language to statutory provisions outlining the Commission's duties, Congress directs the Commission to act "consistent with all pertinent provisions of any Federal statute. 28 U.S.C. § 944(a) (as amended by § 401 of the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act, Pub. L. No. 108-21, 117 Stat. 650 (2003) ("PROTECT Act")). The Commission is also required to consider the same factors that a sentencing court is required to consider under 18 U.S.C. § 3553(a). Notably, the Guidelines are to take into account, to the degree relevant, certain characteristics of the offense, including "the nature and degree of the harm caused by the offense," "the community view of the gravity of the offense," "the public concern generated by the offense," "the deterrent effect a particular sentence may have on the commission of the offense by others," and "the current incidence of the offense in the community and in the Nation as a whole." 28 U.S.C. § 944(m).

The SRA also instructs the Commission to take into account, to the degree relevant, certain characteristics of the offender, including criminal history, while assuring that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders. *Id*. at § 944(d). Furthermore, "in recommending a term of imprisonment or length of a term of imprisonment," the SRA requires the guidelines and

policy statements to reflect the "general inappropriateness of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant." *Id*. at 944(e).

Congress created the Sentencing Commission and established the process by which the Commission promulgates federal sentencing guidelines and policy statements. Notwithstanding the delegation of authority provided the Commission in the SRA, Congress retained ultimate authority over the federal sentencing guidelines. In addition to its power to disapprove guideline amendments, Congress retains the ability to influence federal sentencing policy by enacting directives to the Commission. When Congress enacts such a provision, the Commission is obligated to implement the directive in a manner consistent with the legislation. The Supreme Court has stated that, "Congress has delegated to the Commission significant discretion in formulating guidelines . . . . Broad as that discretion may be, however, it must bow to the specific directives of Congress." *United States v. LaBonte*, 520 U.S. 751, 757 (1997).

The current sentencing landscape is as follows. *United States v. Booker*, 543 U.S. 220 (2005), held that the mandatory Guidelines system codified in the SRA of 1984 violated the Sixth Amendment. *Id*. at 250. In its place, the Court identified two features of the SRA that would remain and work together "to move sentencing in Congress' preferred direction." *Id*. at 264. First was a continued important role for the Sentencing Guidelines. *See id*. at 264-65. While not bound to apply the Guidelines, district courts must consult those Guidelines and take them into account when passing sentence. *Id*. at 264.

Second, in reviewing sentences, appellate courts will apply a "reasonableness" standard of review, which Justice Stevens "expressly equated with the old abuse-of-discretion standard used to review sentencing departures." *Rita v. United States*, 551 U.S. 338 n. 2, 127 S. Ct. 2456,

4

2471 n. 2 (2007) (Stevens, J. joined by Ginsburg, J., concurring). In *Booker*, the Court recognized that reasonableness review could not "provide the uniformity that Congress originally sought" in enacting the SRA and its scheme of mandatory Guidelines, but reasonableness review would still "tend to iron out sentencing differences." *Booker*, 543 U.S. at 263.

*Booker* further held that "reasonableness" was to be measured against the factors outlined by Congress in 18 U.S.C. § 3553(a). *Id.* at 261. The Court further explained that the 3553(a) factors would not only guide district courts in sentencing, but would also guide appellate courts in determining whether a sentence is reasonable. *Id. accord United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005) ("We must evaluate whether the sentence imposed by the district court fails to achieve the purposes of sentencing as stated in 3553(a).").

In *Rita*, the Court concluded that appellate courts could properly presume that a properly calculated within Guidelines sentence was reasonable. *Rita* also explained that when a sentence is imposed outside the Guidelines, "the judge will explain why he has done so." *Rita*, 127 S.Ct. at 2468.

In *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586 (2007), the Supreme Court specifically addressed "whether a court of appeals may apply a 'proportionality test' and require that a sentence that constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances." 128 S.Ct at 591. The Court determined that "while the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant, courts of appeals must review all sentences – whether inside, just outside, or significantly outside the Guidelines range – under a deferential abuse-of-discretion standard." *Id*. *Gall* also reminded that all sentencing proceedings should begin by correctly calculating the applicable Guidelines range. *Id*. at 596. The Court emphasized that "after giving both parties an

5

opportunity to argue for whatever sentence they deem appropriate, the district court should then consider all the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id*.

*Gall* created a two-step process for reviewing a district court's sentence. First, the appellate court must ensure that the district court did not commit any significant procedural error, such as failing to calculate, or miscalculating, the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range. *Gall*, 128 S.Ct. at 597. This first step highlights the continued importance of the Guidelines, and the Court's intention in *Booker* for the "continued use of the Guidelines in an advisory fashion" to "further the purposes of Congress in creating the sentencing system to be honest, fair, and rational." *United States v. Pugh*, 515 F.3d 1179, 1190 (11th Cir. 2008) (quoting *Talley*, 431 F.3d at 787). *Gall* explained that a district judge

> must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and *ensure that the justification is sufficiently compelling to support the degree of the variance*. We find it uncontroversial that a *major departure should be supported by a more significant justification than a minor one*.

*Gall*, 128 S.Ct at 597; *Pugh*, 515 F.3d at 1190 (emphasis in original).

In sum, district courts must consult the Guidelines and take them into account when sentencing. They must also properly calculate the Guidelines range and include an explanation for any deviation from the Guidelines range. *Booker*, 543 U.S. at 264; *Gall*, 128 S.Ct. at 597. *Accord Pugh*, 515 F.3d at 1190.

The second step involves a review for substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. In conducting this review, the appellate court

will take into account the totality of the circumstances, including the extent of any variance from the Guidelines range.  If the sentence is within the Guidelines range, the court may, but is not required to apply a presumption of reasonableness.  If the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness.  The court may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance.  The fact that the appellate court might reasonably have concluded that a different sentence was warranted is insufficient to justify reversal.  *Gall*, 128 S.Ct at 597.

A sentence may be substantively unreasonable if it does "not achieve the purposes of sentencing stated in § 3553(a)."  *United States v. Martin*, 455 F.3d 1227, 1237 (11th Cir. 2006).  Even under an abuse-of-discretion standard for reasonableness, courts must weigh the § 3553(a) factors in a manner that does not yield a demonstrably unreasonable sentence as dictated by the facts of the case.  *Pugh*, 515 F.3d at 1191.   Symptoms of a substantively unreasonable sentence can be manifested by an unjustified reliance on any one § 3553(a) factor, reliance on impermissible factors, or failing to consider pertinent § 3553(a) factors.  *Pugh*, F.3d at 1191-92 (citing cases); *United States v. Willingham*, 497 F.3d 541, 543-44 (5th Cir. 2007) (asking if sentence: (1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors) (citations omitted)).  However, "while the application of these analyses may suggest an unreasonable sentence, they do not necessarily make a sentence unreasonable: *Gall* itself found that the district court did not commit reversible error simply because it 'attached great weight' to a single factor."  *Pugh*, 515 F.3d at 1192 (quoting *Gall*).

7

### B. The §3553 Factors Weigh Heavily Against a Downward Variance

Since the Guidelines are advisory and only one factor to be considered by the Court in determining a sentence under 18 U.S.C. §3553, the United States will frame its request within the factors set forth in §3553, and proceed through those factors in the order in which they appear in the statute.

#### 1. 18 U.S.C. §3553(a)(1):  The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The Government's Motion for Pretrial Detention (DE 14) and the Stipulated Proffer of Factual Basis for Plea of Guilty (DE 33) outlined in detail the nature of the defendant's actions in this case.  The Government does not seek to restate those facts here, but does wish to point out circumstances of the defendant's case which highlight the sophisticated level of manipulation and deception used by the defendant to lure his victims. The facts of the defendant's crimes recounted in the Government's previous pleadings only tell part of the story. The defendant created a Facebook account using the alias of "Jonathan Langley." In the fall of 2013, the defendant "friended" 14 year old R.K. on Facebook. After conversing with her for a few weeks, he began to press for an in person meeting. He offered to purchase alcohol for her, and began sending her sexually explicit photographs of himself taken at his workplace, a Mattress Firm store in Vero Beach. He also encouraged her to send sexually explicit photographs of her to him, and she did. She also met him one morning at the Mattress Firm, where R.K. reported they "tried out" various mattresses in the store. She denied, however, that any sexual activity occurred between them. He did, however, send her a Facebook message telling her, "I am sexually attracted to you." R.K. cut off contact with the defendant when he coincidentally showed up one night at a youth group meeting at her church and she learned that he had been lying about his true identity.

8

Simultaneously, the defendant was communicating with 13 year old C.R. in December of 2013. To gain her trust, he repeatedly told her he was not interested in sexual activity because he was too old for her. C.R. was emotionally vulnerable and confided to the defendant personal details about life choices she had made which she regretted. The defendant played the role of counselor and confidante to C.R., encouraging her to talk to him about her problems. An example of this can be seen in his messages to her on December 28, 2013:

> **Defendant:** just saw your post. A broken heart is not fun and hurts extremely bad, but for every broken heart there is something out there ready to mend it!
>
> **Defendant:** You're awesome :)
>
> **C.R.:** Thanks also | ugh I've just been having a rough couple of days ..
>
> **Defendant:** what exactly happened? if you don't want to talk about it I understand. I can be The one person that you can talk about something else with :)
>
> **C.R.:** So I've been dealing with self harm for a couple of years now. It started out when My brother turned to drugs and caused us all to worry. And over time he got worse, causing me to be more and more depressed, because well, he is my idol, he's the person I look up to. He stole thousands of dollars worth of jewelry from my mother including her wedding ring etc.. I attempted to commit suicide multiple times, but each time something always stopped me. My brother over dosed popping pills a handful of times, thankfully he's still alive! Last year, someone reported me to my school about what I was doing , they took me in, asked me questions, and sent me to a mental health facility. I stayed there for a little bit. Waking up every morning surrounded my a bunch of crazy psychos.. Seriously, they treated me like a retard. Once I got out I was sorta forced to do therapy every week for months. When I got out, I made a promise not to self harm.. Ever.. Again. Well, I didn't really keep that promise. I've done it a couple times since then. I started to turn to drugs and alcohol. Smoking daily, and drinking like a leprechaun. <- therefore, causing me to fall into worse depression. But instead of just killing myself I drank the pain away. Ugh I was so sick and disgusting
> My brother finally decided he wanted help, so we sent him to a rehab facility where they kept him for a few months. He got out and went to a halfway house (if you know what that is). He was there for a little while, and one day he came home to visit and his "friends" got him on drugs again.. He felt really guilty though. He turned himself in and went back to rehab.. Today he is committed to staying clean and is currently in a different halfway house. Me on the other hand is trying my hardest to get myself out of this hole I fell into. I recently have kind of turned to sex weed and alcohol on weekends. Ugh.
> Today, I ended up cutting again and I am so not happy with myself. I'm disgusted.
>
> **Defendant:** Look I have never dealt with stuff like that. BUT I would have to say that whatever if making you have these feelings you need to completely kick them out. If it is people, remove them from you lives, if it is guilt, talk to someone about what you feel guilty over. I don't know you, really at all, just from talking to you on here you seem like you could have a lot going for you. You are beautiful, you seem to have a very good

9

personality (you have made me seriously LOL a couple of times) Like I said I don't know anything about the drug life or self harm, but I do believe that people can overcome addictions and self pitfalls. I've seem many people come out of horrible holes and turning their life completely around. So I think that you can do it! And I am here to talk to about whatever and as much as I possibly can. I know that might not mean too much coming from some random guy on facebook but I mean it, and I know you can get it all straight! Gotta believe and actually work towards it. Then you will achieve it!

**C.R.:** You have me crying.. Happy tears ☺ ☐ thank you so much for being a great person, even though you don't have to be. It means a lot.

**Defendant:** my parents raised me well. I put other people before myself. Not a bad thing either. Of course I take care of my needs first. But I am always here to help a fellow person. So any concerns or questions always feel free to ask me! If I or you were closer in age I could be more hands on and be like a "sponsor" of sorts. But I can still be your Facebook Buddy! :) :)

**Defendant:** Well like I said you can always talk to me. i know it is harder to type stuff. Maybe one day in person. But stick to on here. I'm a good listener/reader :)

**C.R.:** You're attractive, a good speller, kind, funny, caring, and you give good advice? Something isn't right here.

**Defendant:** I agree

**Defendant:** I'm too old! Lol

The defendant skillfully developed his relationship C.R. for four months following this exchange until their first sexual encounter on April 22, 2014. When C.R. questioned whether the defendant was telling the truth about his identity, he reassured her, stating, "I am 21. I am that guy from the pictures. I am not a wierdo. I don't know how else to prove it though." He repeatedly sought to meet her in person, preying on her low self-esteem by showering her with compliments and offering to bring her alcohol and marijuana. Following his first sexual encounter with her, the defendant pressed her repeatedly for additional meetings while behaving in a very solicitous manner towards her.

Unbeknownst to C.R., at the same time the defendant was wooing her he was also pursuing 12 year old A.L. Between April and July, 2014, the defendant followed the same pattern he used with C.R. He complimented A.L. and showed great interest in her. Like C.R., A.L. was an emotionally vulnerable child. Her father was in prison and her mother had

10

abandoned her. She was being raised alone by her grandmother, who needed to work to support herself and A.L., and was often away from home. As with C.R., the defendant offered to bring intoxicating substances for A.L. He sent her explicit photographs and solicited the same from her. He also took an interest in A.L.'s friends, broaching with her the possibility that they could engage in a "threesome." He repeatedly tried to set up a meeting with A.L., despite knowing that she was underaged and lived with her grandmother. On July 14, 2014, he succeeded in fulfilling his plans when A.L.'s grandmother left the house for a few hours. The defendant obtained a gate code to the complex from A.L. and went to her residence, where he engaged in sexual activity with her. Following this encounter, he sent her numerous, sexually graphic requests seeking additional sexual liaisons.

Records from the defendant's alias Facebook account show that he was communicating with 16 year old S.E. as early as December, 2013. He had no Facebook communications with her in January and February, 2014, but he contacted her again in March and by May of 2015 communicated with her 324 times. S.E., like C.R. and A.L., was a troubled child. Her mother and grandmother would not provide for her and she was living at the home of one of her mother's ex-boyfriends. The defendant exploited S.E.'s lack of stability and began to offer words of encouragement to her:

> 05-19-2015
> **S.E.:** i dont feel good enough for anyone. i cling to people who care about me cause i don't have anyone who does. im so sad and idk what to do anymore.
>
> 05-19-2015
> **Defendant:** well damn. You need to perk up! You are beautiful, chill as fuck, and seem like a genuinely great person. You are young. You don't need a guy to make you feel good if that is what you're talking about. You just need some true good friends.

As with C.R. and A.L., the defendant offered to provide S.E. with alcohol and marijuana, and showered her with compliments. He also volunteered to give her rides in his car when she needed to go somewhere. His promise of a ride and place to stay led to his first sexual encounter

11

with S.E. in the summer of 2014 when he drove her to his home and encouraged her to play with his 3 year old son. Between December, 2013, and August, 2014, he sent or received 783 Facebook messages with S.E.

Between January and August, 2014, the defendant was also communicating with 15 year old M.B. M.B. fit the same profile as the defendant's other victims. She was emotionally troubled, abused alcohol, and had an unstable home life. The defendant followed the same pattern of predatory behavior in his dealings with M.B. He told her he was not interested in sexual activity; he just wanted to "hang out" with her. He heaped compliments upon her. He offered her fatherly advice on her relationship problems, along with repeated requests to meet her in person. The defendant eventually gained her trust enough to meet in person, and until August of 2014, engaged in three sexual encounters with her.

As to the defendant's history and character, the defendant's criminal history shows that he is not unfamiliar with the criminal justice system. When he was 20 years old, he was sentenced for repeatedly stealing from his employer in Virginia. The following year he was convicted of a criminal traffic offense. After he moved to Florida he was arrested for domestic violence battery on the mother of his child. Two years later he was convicted of criminal mischief for destroying a smart phone belonging the same victim. During his evaluation by Dr. Michael Brannon, he admitted that he had been involved in domestic violence with his child's mother.    In total, the defendant's pattern of criminal activity has been escalating.

### 2. 18 USC 3553(a)(2)(a):  To reflect the seriousness of the offense, promote respect for the law, and to provide just punishment

The crimes for which the defendant is to be sentenced are, by their very nature, serious offenses. The statute at issue, however, may be violated in a number of ways through a variety of means. The offense does not require that the defendant lure or entice an actual child; yet he did.

12

The offense does not require that the defendant create a fake identity to carry out his crimes; yet he did. The offense does not require that the defendant use a social media site used by millions of children; yet he did. The offense also does not require that the defendant engage in sexual acts with his victims; yet he did. That he did not just once, twice, or even three times. He did it repeatedly. The defendant's predatory behavior represents among the most serious violations of a serious crime. The advisory guidelines range is reasonable under the circumstances of his case, especially when considering the lasting emotional impact the defendant's crimes will undoubtedly have on victims who were already emotionally troubled. A sentence within the advisory guidelines range will also serve as a reminder to others of the consequences of failing to respect the law.

### 3. 18 USC 3553(a)(2)(b):  To afford adequate deterrence to criminal Conduct

The criminal conduct at issue is the sexual exploitation of children, among the most reprehensible of offenses. A sentence within the advisory guidelines range would certainly provide specific deterrence for the defendant. He would no longer have the freedom to troll the internet for minors to manipulate and abuse. The Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class," and has found that "[t]he risk of recidivism posed by sex offenders is frightening and high." *Smith v. Doe*, 538 U.S. 84, 103 (2003). The Supreme Court has gone even further, finding that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *McKune v. Lile*, 536 U.S. 24, 33 (2002). Such a sentence would also serve as a general deterrence for others. The advisory guidelines range of 292-365 months should be a severe enough sanction to gain the attention of

those tempted to engage in similar activities and to protect other female minors from the defendant's predatory criminal sexual acts.

### 4. 18 USC 3553(a)(2)(C):  To protect the public from further crimes of the defendant

An analysis of the defendant's Facebook activities shows that between November, 2013, and July, 2014, he engaged in an increasing pattern of contact with underaged girls. (The Government will present an exhibit at sentencing supporting this statement) In November, 2013, he communicated 559 times with four different females. Five hundred forty-seven of those communications were with two females known to be under the age of 18 – M.B. and D.S. In December of 2013, the defendant had 1,572 communications with ten different females. One thousand four hundred and sixty-two of these communications were with six females believed to be under the age of 18. By April, his communications had increased to 3,424 communications with sixteen different females, twelve of whom are believed to be minors. The quantity of the defendant's communications remained consistent through July of 2014. Between June and July, 2014, the defendant engaged in sexual activity with C.R., A.L., S.E., and M.B. If law enforcement had not detected him in August, 2014, the defendant would have continued seeking out vulnerable minor female victims to engage in illegal sexual activity.

### 5. 18 USC 3553(a)(3) and (4):  The kinds of sentences available and the sentencing range established for the offense

Title 18, U.S.C., §2422(b) mandates that the defendant receive ten year sentence, up to life in prison, for each offense. The advisory guidelines sentencing range of 292-365 months represents only a fraction of the maximum possible sentence for the 26 year old defendant. Even if he were sentenced to the top of the guidelines range, the defendant would be eligible for

14

release in his early to mid-50's. The statute also authorizes lifetime supervision to adequately monitor the defendant upon his release and protect the public.

### 6. 18 USC 3553(a)(5): Any pertinent policy statement issued by the Sentencing Commission

The policy statement issued by the Sentencing Commission at U.S.S.G. §5K2.0(b) advises against a departure from the Guidelines sentence in matters of this sort, as it provides:

> DOWNWARD DEPARTURES IN CHILD CRIMES AND SEXUAL OFFENSES.--Under 18 U.S.C. § 3553(b)(2)(A)(ii), the sentencing court may impose a sentence below the range established by the applicable guidelines only if the court finds that there exists a mitigating circumstance of a kind, or to a degree, that--
>
> (1) has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued under section 994(a) of title 28, United States Code, taking account of any amendments to such sentencing guidelines or policy statements by act of Congress;
>
> (2) has not adequately been taken into consideration by the Sentencing Commission in formulating the guidelines; and
>
> (3) should result in a sentence different from that described.
>
> The grounds enumerated in this Part K of Chapter Five are the sole grounds that have been affirmatively and specifically identified as a permissible ground of downward departure in these sentencing guidelines and policy statements. Thus, notwithstanding any other reference to authority to depart downward elsewhere in this Sentencing Manual, a ground of downward departure has not been affirmatively and specifically identified as a permissible ground of downward departure within the meaning of section 3553(b)(2) unless it is expressly enumerated in this Part K as a ground upon which a downward departure may be granted.

The Government asserts that there is no mitigating circumstance at all in this matter, much less one that meets the rigorous criteria set forth in this policy statement.

### 7. 18 USC 3553(a)(6): The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

The defendant provided the court with two examples where defendants received downward variances, *United States v. Joseph Kohler*, Case No. 10-14077-Cr-Martinez and *United States v. Joshua Bagala*, Case No. 13-14030-Graham. Both of these cases, however, are easily distinguishable from the instant case. In *Kohler*, the defendant distributed child pornography and attempted to lure or entice another minor through the internet. Unlike the defendant in this case, Kohler neither engaged in sexual activity with a minor nor attempted to meet one. He posed as a fourteen year old female on-line and encouraged other teenaged girls to show him their underwear and breasts. In *Bagala*, the defendant was convicted of receiving and transporting child pornography. Unlike the defendant in this case, he did not communicate with any underaged children or engage in sexual acts with any children.

The defendant's actual victimization of underaged females, and his prolific efforts to do so, sets him apart from Kohler and Bagala. In cases where the defendant engaged in sexual activity with children, other courts have sentenced the defendants to the advisory guidelines sentence or beyond. *United States v. Sarras*, 575 F.3d 1191, 1208, 1220-21 (11th Cir. 2009) (upholding as reasonable a 100-year sentence for a first-time offender who sexually abused a 13-year-old girl and produced pornographic images of the victim); *United States v. Johnson*, 451 F.3d 1239, 1244 (11th Cir. 2006) (upholding as reasonable a 140-year sentence for abusing and photographing three boys between the ages of 8 and 16 based on consecutive statutory maximums under 18 U.S.C. § 2251(e) and § 2252A(b)(1)); *United States v. Kapordelis*, 569 F.3d 1291, 1318-19 (11th Cir. 2009) (upholding as reasonable a 420-month sentence, which represented an upward variance from the 262-327-month advisory guidelines range and included

240-month sentences on counts charging production of child pornography under § 2251(a) and 180-month consecutive sentences on counts charging receipt of child pornography under § 2252A(a)(2)(A)); *United States v. Huffstatler*, 561 F.3d 694, 698 (7th Cir. 2009) (upholding as reasonable an above-guidelines, 450-month sentence for producing pornographic pictures of a 14-year-old boy); *United States v. Raplinger*, 555 F.3d 687, 695 (8th Cir. 2009) (upholding as reasonable a 457-month sentence for photographing and having sexual intercourse with a 15-year-old girl), *cert. denied,* 129 S.Ct. 2814 (2009); *United States v. Betcher*, 534 F.3d 820, 827-28 (8th Cir. 2008) (upholding as reasonable a 750-month (62.5 year) sentence for a first-time offender who had taken pornographic pictures of five 8- to 11-year-old girls, including two of his granddaughters), *cert. denied*, 129 S.Ct. 962 (2009).

### 8. 18 USC 3553(a)(7):  The need to provide restitution to any victims of the offense

Enticing a minor to engage in sexual activity in violation of 18 U.S.C. §2422(b) is a "crime of violence" within the meaning of the Mandatory Victim Restitution Act, 18 U.S.C. §3663A. *United States v. Keelan*, 786 F.3d 865 (11th Cir. 2015). There is one claim for restitution for counseling expenses related to victim A.L., in the amount of $400. The victim's need for this amount of restitution does not support an argument for a downward variance.

### III. The Defendant Has Not Offered Sufficient Grounds For A Downward Variance

The defendant has offered scant justification for a downward variance in his case. He cites primarily to what he terms "excessive enhancements" in his advisory sentence that resulted in "the almost universal and automatic application of enhancements." None of the enhancements applicable to his case, however, were automatic or universal to violations of 18 U.S.C. §2422(b). Not all defendants who violate this statute engage in a pattern of such violations, nor do they create a false identity to do so. Likewise, not all defendants who violate this statute engage in

17

sexual activity with children, nor do they do so more than once. This defendant's own actions are what have set him apart from other defendants charged with this offense. If the defendant had not voluntarily engaged in such actions, he would not have an advisory guidelines level of 39. It would be much lower. The fact that his sentencing range is so high is not due to the arbitrary application of "excessive enhancements." His sentencing range is so high because *he chose* to engage in conduct that warranted the application of the enhancements.

The other proffered reasons for a downward variance are unavailing. The defendant's psychologist determined that he was depressed and anxious. Depression and anxiety are common among members of incarcerated populations. Moreover, the defendant's expert did not attempt to establish any link between the defendant's current depression and anxiety and his commission of the crimes at issue. The defendant reported that he was an abuser of marijuana, and that he drank alcohol occasionally. (DE 41 at 17) To the extent that the defendant would benefit from psychological or substance abuse services, the Bureau of Prisons has options available to him. Substance abuse, however, "ordinarily is not a reason for a downward departure." Guidelines Manual §5H1.4. The defendant has also not claimed that his use of marijuana led him to create a false identity and prey upon vulnerable girls for his own sexual gratification. The defendant further pointed out in his request for a variance that he had enlisted in both the Army and Navy. Notwithstanding his intention to enlist, he never actually served in either branch of the Armed Services. His effort in enlisting, however laudable, is not a sufficient ground for downward variance.

### IV. Conclusion

The defendant noted in his request for a variance that the advisory sentencing range in his case "should be saved for only the worst offenders." What he fails to appreciate is that he *is* one

of the worst offenders for the manner in which he violated 18 U.S.C. §2422(b). The defendant's crime was not an isolated incident. His actions showed that he evinced a heightened premeditation in creating a false identity solely for the purpose of luring young girls into sexual liaisons with him. He approached his conquests with a level of gamesmanship and manipulation that sets him apart from those offenders deserving of lesser sentences. For the reasons stated above, the Government opposes the defendant's request for a downward variance in this case.

Respectfully submitted,

WILFREDO A. FERRER
UNITED STATES ATTORNEY

By:   s/*Ryan L. Butler*
Ryan L. Butler (S.D. Bar #A5501914)
Special Assistant United States Attorney
101 S. U.S. Hwy 1, Suite 3100
Fort Pierce, Florida 34950
TEL: 772-466-0899
FAX: 772-466-1020
Attorney for Plaintiff U.S.A.
Email: rbutler@sao19.org

**CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/*Ryan L. Butler*
Ryan L. Butler
Special Assistant United States Attorney

19

## SERVICE LIST

Ryan L. Butler
Special Assistant United States Attorney
101 South U.S. Highway 1, Ste 3100
Fort Pierce, Florida 34950
Telephone: (772) 466-0988
Facsimile: (772) 466-1020
rbutler@sao19.org
Attorney for the United States
Method of Service:  CM/ECF

Diana Acosta
Assistant United States Attorney
101 South U.S. Highway 1, Ste 3100
Fort Pierce, Florida 34950
Telephone: (772) 466-0988
Facsimile: (772) 466-1020
Diana.Acosta@usdoj.gov
Attorney for the United States
Method of Service:  CM/ECF

Panayotta Augustin-Birch, AFPD
Email: panayotta_augustin-birch@fd.org
Federal Public Defender's Office
109 North 2nd Street
Ft. Pierce, FL 34950
Telephone:772-489-2123
Attorney for Defendant
Method of Service: CM/ECF