```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                       FORT PIERCE DIVISION
                     CASE NO.  15-14010-CR-JEM
 3

 4

 5    UNITED STATES OF AMERICA,

 6                   Plaintiff,

 7         vs.

 8                                        Fort Pierce, Florida
                                          August 25, 2015
 9    JAY FREDRICK NAGEL,                 Pages 1-44

10                   Defendant.
      _____

11

12                   TRANSCRIPT OF SENTENCING HEARING
                  BEFORE THE HONORABLE JOSE E. MARTINEZ
13                   UNITED STATES DISTRICT JUDGE

14
      APPEARANCES:
15
      FOR THE PLAINTIFF:
16                           United States Attorney's Office
                             BY:  RYAN BUTLER, A.U.S.A.
17                           BY:  RUSSELL KILLINGER, A.U.S.A.
                             101 South US Highway 1
18                           Suite 3100
                             Fort Pierce, Florida 34950
19
      FOR THE DEFENDANT:
20                           Federal Public Defender's Office
                             BY:  PANAYOTTA AUGUSTIN-BIRCH
21                           109 North Second Street
                             Fort Pierce, Florida 34950
22
      REPORTED BY:           DAWN M. WHITMARSH, RPR
23                           Official Court Reporter
                             400 N. Miami Avenue, 10S03
24                           Miami, Florida  33128
                             Telephone:  305-523-5598
25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2            COURTROOM DEPUTY:  Case number
 3   15-14010-criminal-Martinez, United States versus Jay Fredrick
 4   Nagel.
 5            Counsel, please state your appearances.
 6            MR. BUTLER:  Good afternoon, Your Honor.  Ryan Butler
 7   and Russell Killinger on behalf of the United States.
 8            THE COURT:  Good afternoon, gentlemen.
 9            MS. AUGUSTIN-BIRCH:  Good afternoon, Your Honor.
10   Panayotta Birch on behalf of Jay Nagel, and he's present before
11   the court.
12            THE COURT:  Good afternoon, Ms. Birch.
13            Can I get an appearance from Probation?
14            THE PROBATION OFFICER:  Good afternoon, Your Honor.
15   Edward Cooley for United States Probation.
16            THE COURT:  Okay.
17            All right.  We're here on the sentencing on Mr. Nagel.
18   I have reviewed the order adopting the Magistrate's report and
19   recommendation on a change of plea and I'd like the record to
20   reflect, if it is true, that this was done at the convenience of
21   the parties and the request of the parties, because no District
22   Judge was in the area; is that correct?
23            MR. BUTLER:  That's correct, Your Honor.
24            MS. AUGUSTIN-BIRCH:  That's correct, Your Honor.
25            THE COURT:  Okay.  I've also reviewed the stipulated
```

1    proffer of factual basis and written plea agreement; the

2    presentence investigation, note that the defendant requests that

3    any term of imprisonment be served at a facility in Virginia,

4    which if I don't put it into my order orally, it will be in my

5    written order.  I have no objection to that.

6          Note that there has been an adjustment for acceptance

7    of responsibility.  No objections reported by the government.

8    I've reviewed the defendant's objections to the presentence

9    investigation and the psychological evaluation that was

10   submitted to me.  I've reviewed the government's response to the

11   defendant's objections; the defendant's request for a downward

12   variance, the government's response in opposition to the request

13   for downward variance; the letters that were filed on behalf of

14   the defendant, I think there were three different submission,

15   and I'm ready to proceed at this time.

16          I'll be happy to hear from both sides.  Ms. Birch,

17   perhaps you should tell me what your objections are because if

18   you don't raise them now, I will consider them to be waived.

19          MS. AUGUSTIN-BIRCH:  Thank you, Your Honor.

20          Under 3D1.2, the counts in this case are not grouped.

21   And I did file an objection regarding that.

22          THE COURT:  Yeah, I looked into that and I've got to go

23   along with the Probation Office.  I think that it properly is

24   not grouped.  I don't think it's supposed to be grouped and I

25   don't think -- and I will deny or overrule your objection on

1   that basis.

2        MS. AUGUSTIN-BIRCH:  I understand that, Your Honor.  I

3   just need to make a record.

4        THE COURT:  You got a record.  You've got your written

5   record and you've also said what you said.

6        MS. AUGUSTIN-BIRCH:  Yes, Your Honor.  Also there's no

7   case law on this issue in the Eleventh Circuit.  There are case

8   law, as the government pointed out in their response to my

9   objections, so this would be a case of first --

10        THE COURT:  They cited Ninth Circuit, didn't they?

11   Those guys get reversed every three days, don't they?

12        MS. AUGUSTIN-BIRCH:  The Seventh and the Fifth.  Yes,

13   Your Honor.  If I remember correctly. I would just like to

14   preserve.

15        THE COURT:  I'm just kidding as a matter of fact, but

16   there may not be Eleventh Circuit, but I think there is adequate

17   appellate law on this subject and I believe that the Probation

18   Office calculated it properly.

19        MS. AUGUSTIN-BIRCH:  Yes, Your Honor.  Thank you.

20        THE COURT:  What else you got?

21        MS. AUGUSTIN-BIRCH:  That was it for the objections.

22        THE COURT:  All right.  Now the downward variance.  Do

23   you want to talk about that?  Tell me why you think you're

24   entitled to a downward variance.

25        MS. AUGUSTIN-BIRCH:  Yes, Your Honor.  I'm not going to

1    repeat everything that is in my motion, but I do have some

2    additional comments --

3            THE COURT:  Go ahead.

4            MS. AUGUSTIN-BIRCH:  -- that I would like to make.

5            First, I'd like the court to take notice --

6            THE COURT:  Ms. Birch, have I ever told you not to

7    talk?

8            MS. AUGUSTIN-BIRCH:  No, you've never done that, Your

9    Honor.

10           THE COURT:  I listen to you.  Feel free.

11           MS. AUGUSTIN-BIRCH:  Yes, Your Honor.  Mr. Nagel's

12   mother, father and sister and his grandmother, they're all here,

13   they traveled from Virginia.  Also, he has other family and

14   friends that support him and they're also present in the

15   courtroom.  And I will have three people that would like to

16   address the court.  They did not write any letters.

17           THE COURT:  Okay.  You do understand that I don't take

18   letters and then get testimony.

19           MS. AUGUSTIN-BIRCH:  I do understand, and these three

20   people did not write a letter and they will address the court

21   when I'm finished.

22           THE COURT:  Whenever you want.

23           MS. AUGUSTIN-BIRCH:  First Your Honor, in looking at

24   the history and characteristics of Mr. Nagel, as I stated

25   before, he does have family support and he has a loving family.

1    They all know why he was charged, they all know that he pled

2    guilty and they all know that he's here for his sentencing

3    today.

4        His family is primarily for -- sorry, from Virginia.

5    He does have a three-and-a-half year old child.  He attended

6    some college and he does have some criminal history which led

7    him into a criminal history Category 2.

8        In looking at the nature and the circumstances of the

9    offense, we do have a very delicate situation here where

10   Mr. Nagel had sex with teenaged girls.  It's a very delicate

11   subject, as Your Honor saw the facts in the presentence

12   investigation report, but I would like to discuss a few things

13   about the nature and circumstances of the offense.

14       In its response, the government does make a big deal

15   about the fact that Mr. Nagel was using a Facebook page under

16   the identity of another person by the name of Mr. Langley.  Now

17   Your Honor, I want to talk about that for a moment because I

18   think it's important for the court to realize why he had a

19   Facebook page under the name of someone else.

20       He did it primarily to hide the Facebook page from his

21   girlfriend.  At the time, he was involved in a relationship with

22   the mother of his child and the reason he had that Facebook page

23   was because he did not want her to know that he had all of these

24   conversations with other females on his Facebook page.

25       And also, Judge, I'm not going to excuse his behavior,

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

I'm not going to excuse the conversations that he had with those

teenaged girls, but when you look at the context of all the

messages, it's obvious from the messages that of some of these

girls were very experienced, more experienced than a mother or a

parent would want their 13-year-old or 12 or 14-year-old child

to be, but I think it's also important to look at a punishment

and a sentence that's going to be sufficient and not greater

than necessary.

Your Honor has to determine a sentence to reflect the

seriousness of the offense, promote respect for the law and to

provide just punishment.  To afford adequate deterrence to

criminal conduct.

In this case, Your Honor, there is a minimum mandatory

of ten years.  Mr. Nagel's guideline range is 292 to 365 months.

Even looking at a sentence as low as ten years, that is still a

very long and lengthy sentence.

In looking at other factors to protect the public from

further crimes of Mr. Nagel, he's definitely taken the first

step by recognizing that his actions were wrong and he's going

to address you later during this proceeding.  Not only has he

hurt the teenaged girls and their families that are involved in

this case, but he's also hurt his family and specifically, aside

from his parents and his sister, he has a three-and-a-half year

old son that is going to grow up without him being around.

He's definitely amenable to treatment.  He knows that

1    he has a problem and that problem needs to be addressed as well

2    in counseling.

3            Sentencing him to a guideline sentence, Your Honor --

4    he is 26 years old right now.  If Your Honor was to impose a

5    guideline sentence, he would not be getting out until he's in

6    his 50s. And I stand before you asking to court to consider a

7    sentence less than the guideline range.

8            Once he's released, he's going to have to follow strict

9    sex offender registration, he'll have restrictions on where he

10   can live, where he can go, he'll have to follow both state and

11   federal.

12           Obviously in this type of case under the statute,

13   Congress has set a minimum mandatory of ten years in this case.

14   I know the government addressed in their response to my motion

15   concerning policy statements issued by the Commission.  I'm

16   here, not asking for a downward departure involving this sexual

17   offense, I am asking for a variance in this case.  And as Your

18   Honor aware, after the Booker case in 2005, the court can look

19   at all of the 3553(a) factors in considering an appropriate

20   sentence in this case.

21           THE COURT:  I have no doubt that I can do that.  I

22   don't want the record to be in any doubt.  I know that I can.

23           MS. AUGUSTIN-BIRCH:  Yes, Your Honor.

24           THE COURT:  But I also think that the Sentencing

25   Commission has the absolute right to -- and duty to speak for

1    the community and make recommendations, and they have in this

2    case.  It's a serious crime.  It's a very serious crime.  It is

3    one of the most serious ones that you can possibly have.  This

4    is -- it's a terrible thing.

5            MS. AUGUSTIN-BIRCH:  Yes, Your Honor. And I'm going to

6    address specifically the guidelines, and I have some other

7    examples of cases that I would like to share with the court.

8            The need to avoid unwarranted sentence disparities

9    among defendants with similar conduct.  First, initially

10   Mr. Nagel was charge in state court.  In state court, this case

11   comes under a lewd and lascivious battery, which is a

12   second-degree felony with a maximum penalty is 15 years per

13   count.

14           In the Middle District of Florida, in United States

15   versus Edward Vadnay, V A D N A Y, in that case, the defendant

16   posted an advertisement on the Internet requesting young girls'

17   underwear.  An undercover FBI agent posed as the father of a

18   six-year-old and a ten-year-old in that case, and the FBI agent

19   acted as though he was the parent of the six-year-old and the

20   ten-year-old.  When the defendant, Mr. Vadnay, made contact with

21   the undercover agent, the undercover agent posing as the father

22   agreed that he would permit the defendant in that case to engage

23   in sexual intercourse with the six and the ten year old.

24   Eventually, the defendant was arrested at a meeting location and

25   he was charged under the same statute that Mr. Nagel stands

1    before the court, and he was specifically charged with attempted

2    sexual enticement of a minor.  In that case, his guideline range

3    was 168 to 210 months and he was sentenced to 204 months and the

4    Eleventh Circuit court of appeals upheld that sentence.

5           I bring these examples just to show some of the other

6    conduct that also qualifies under the same statute that

7    Mr. Nagel is charged with.

8           Another case, United States versus David William Scott,

9    which is also in the Middle District of Florida, in that case

10   Mr. Scott was charged under the same statute that Mr. Nagel is

11   charged with, and he was also charged with traveling in

12   interstate commerce to engage in a sexual act with a person

13   under 18.  And he was also charged with crossing the state lines

14   to engage in sexual activity with a person under 12.

15          In that case, the undercover FBI agent joined and

16   online message board, and the purpose of that board was to allow

17   adults with children to meet other adults for the purposes of

18   arranging a meeting with children to have sex.

19          In the profile, the undercover agent indicated that he

20   had a six-year-old boy and a four-year-old girl.  Scott, who is

21   the defendant in that case, he responded to the message board

22   and he indicated that he wanted to have sex with the undercover

23   agent's six-year-old boy, as well as the four-year-old girl. He

24   also talked about -- Mr. Scott in that -- the defendant in the

25   case, also talked about the fact that he had a young niece and

1    that he was working on the niece, and he specifically stated in

2    his e-mail to the undercover agent if you can get them trained

3    young enough, they don't talk.  But as I said, I wasn't even in

4    the state for the first five years, didn't have much of a

5    chance.  And he also stated in the e-mail I have discovered that

6    a good way to make friends with small ones, and most big ones

7    for that matter, is to bring them gifts.

8         In that case, Mr. Scott's guideline range was 135 to

9    168 months and he was sentenced at the low end of the guideline

10   range of 135 months, and that sentence was upheld by the court

11   of appeals.

12        And another case that the court is familiar with is

13   United States versus Irey.  In that case, the defendant was

14   initially sentenced to a sentence of 210 months but then that

15   was reversed on appeal, and then he was sentenced to a sentence

16   of 30 years.  In that case, the facts are a lot more egregious

17   than the facts that you have before you in Mr. Nagel's case.  In

18   the Irey case, it all started when Mr. Irey would go to China on

19   business monthly, and on the weekends while he was there he

20   would travel to other brothels in the Asian -- the different

21   Asian countries.  He went to one in Cambodia where they featured

22   underage girls, and he discovered that he wanted to have sex

23   with children.

24        Irey was 5'10", and he weighed 200 pounds and he was

25   about 40 years old at the time.

1          All of the children that he actually abused were

2     underage girls and some of them were four, five or six years

3     old.  He paid brothels up to $1,500 for each use of a child and

4     typically, when he would go to Cambodia he would typically buy

5     two or three children at a time.

6          And again, I point out the ages and the difference from

7     Mr. Nagel's case.

8          THE COURT:  Was that my case?  Is that why I should

9     know it?

10          MS. AUGUSTIN-BIRCH:  No, it's an Eleventh Circuit court

11     case that came out a couple years ago.

12          THE COURT:  I thought maybe it was mine and I put it

13     out of my mind.  I would try, but I don't think I did.

14          MS. AUGUSTIN-BIRCH:  No, it was not your case, Your

15     Honor.

16          THE COURT:  Okay.  Go ahead.

17          MS. AUGUSTIN-BIRCH:  Also when he couldn't get away

18     from China while he was there on business, he would pay to have

19     some of these children come over to where he was in China so

20     that he could have sex with them.

21          When law enforcement arrested him, they confiscated his

22     computers.  It had the images of the children that he had

23     sexually abused, as well as videos.  He took pictures of himself

24     having sex with those children and he also made videos of those

25     children.  Law enforcement, during their investigation, found

that he had victimized at least 50 children.  Not only did he
rape them, he sodomized them and he humiliated the children, as
well as tortured them.  Some of the videos showed that Mr. Irey
was even smiling in some of the videos like, I guess he would
smile at his own camera.

He shared the videos with others online.  Sometimes he
would even contact the web administrator and say if you let me
use the internet service, you know, for free for 30 days, in
exchange I'll give you some of the videos that I have.

Irey's case was definitely not a typical one and it was
definitely outside of the heartland of the cases that usually
come before the court.  It had numerous aggravating factors.
The District Court Judge in that case imposed a sentence below
the guideline range of 240 months, but the Eleventh Circuit
overturned that sentence and the reason it was done, they named
numerous and stated numerous reasons, but it was the extent of
Irey's criminal conduct in that case.  The sexual crimes that
Irey committed was against some of the most vulnerable children
in the world, and it was definitely set apart from other cases.
He raped, sodomized and sexually tortured 50 or more little
girls and some of them were as young as four years old.  He also
scripted, cast, starred in, produced and distributed worldwide
some of the most graphic and disturbing child pornography to
others on various websites.

Here, as I stated before Your Honor, it is a very, very

```
 1   serious case and I am in no way minimizing Mr. Nagel's conduct,
 2   but the reason I brought those other examples from this circuit
 3   is to show the differences between the case that we have here so
 4   that when Your Honor fashions -- I'm asking Your Honor to
 5   fashion a sentence that is sufficient and not greater than
 6   necessary.
 7            Here, the victims in the case are teenagers, Your
 8   Honor.  Again, it is very serious.  And I'm not --
 9            THE COURT:  What's the bottom, 12?
10            MS. AUGUSTIN-BIRCH:  12, 13, 14.  I believe they were
11   all middle school age.  Again, not an excuse, but I bring that
12   up to distinguish it between four, five and six-year-old girls.
13            As far as the facts that occurred in Irey, they are
14   definitely more egregious than what you have here before you in
15   Mr. Nagel's case.
16            THE COURT:  What did Irey end up getting?
17            MS. AUGUSTIN-BIRCH:  30 years.  He was capped out at 30
18   years.  Here Mr. Nagel is looking at a maximum of life, and
19   Irey, he got 30 years, Your Honor.
20            THE COURT:  He got the maximum.
21            MS. AUGUSTIN-BIRCH:  He got the maximum.  Yes, sir.
22            THE COURT:  And the Eleventh Circuit reversed the lower
23   sentence originally, right?
24            MS. AUGUSTIN-BIRCH:  Correct, the 240 month sentence.
25            THE COURT:  20 years, they made them go to 30.
```

1          MS. AUGUSTIN-BIRCH:  Correct.

2          THE COURT:  Okay.

3          MS. AUGUSTIN-BIRCH:  Okay.  And again, those facts are

4     definitely distinguishable from the case before you.

5          In looking at the guideline calculation, his base level

6     is a 28.  He receives two additional -- excuse me.  Two

7     additional levels for misrepresenting identity because of using

8     the Facebook page under the Langley name; for using a computer

9     he gets two additional levels and because the offense involved

10    sex, he receives two more levels for that.  And because they're

11    not grouped and he pled to three different counts, he gets three

12    additional levels under the grouping statute.  And then because

13    he engaged in a pattern of activity involving prohibited sexual

14    conduct, he gets five additional levels.          Now, again, I

15    bring that to the court's attention.  He gets two levels because

16    the offense involved sexual activity, and then he gets another

17    five levels because he engaged in a pattern of activity.  And

18    it's important to point out what is necessary to qualify as a

19    pattern of sexual activity.  All that has to be shown is that

20    there was sexual contact on at least two different occasions,

21    and you qualify for that five level enhancement.

22          So in total, you have -- Mr. Nagel received seven

23    levels in addition to the 28 he already had, as well as the

24    other enhancements and not only because he had sex with the

25    teenage girls, but also because it occurred on more than two

1    occasions.

2              THE COURT:  Ms. Birch, you're not suggesting that his

3    behavior doesn't fit classically into a pattern, because he did

4    do the same thing with several different victims.

5              MS. AUGUSTIN-BIRCH:  I understand that and I'm not

6    suggesting that but I'm --

7              THE COURT:  Okay.  I'm saying, if you look up pattern

8    on the Internet, this would be an example of -- a perfect

9    example of a pattern.

10             MS. AUGUSTIN-BIRCH:  I understand that, but I bring

11   that to the court's attention because of the number of

12   enhancements and what qualifies for that.

13             THE COURT:  I think it's probably what it was designed

14   for.

15             MS. AUGUSTIN-BIRCH:  I understand that, and that's why

16   I'm bringing all of the 3553 factors to the court's attention.

17             THE COURT:  Okay.  Go ahead.  I'm listening.  And I

18   hope you don't think -- I'm backing up because there's a vent

19   that blows straight down where I'm sitting and it's driving me

20   crazy.  I'm about to -- my sinuses are about to kill me.  Wanda,

21   make sure you make a point to have this fixed, please.

22        Go ahead.  I apologize.  I'm backed up because I was right

23   under it.  I'm not trying to ignore you.  As you know I

24   wouldn't.

25             MS. AUGUSTIN-BIRCH:  I know, Your Honor.  Thank you.

1    In looking at all of the 3553 factors and a sentence that is

2    sufficient and not greater than necessary, I submit to the court

3    that a sentence between the guideline range of 293 months to 365

4    months is too high in this case, and I am asking the court to

5    consider and to impose a variance in this case.

6         The only other thing that I need to bring to the

7    court's attention is that his mother, his father and his Florida

8    mom are all going to address the court, and I will call them

9    here to the lectern.

10        THE COURT:  I didn't get a letter from his mom?

11        MS. AUGUSTIN-BIRCH:  No, you did not.  You got a letter

12   from grandmother, but not his mom.

13        Okay.  May I have one moment, please?

14        THE COURT:  Certainly.  Long as you need.

15        MS. AUGUSTIN-BIRCH:  First Your Honor, I have Ms.

16   Bonnie Martinelli.

17        THE COURT:  Yes, ma'am.  Please come forward.

18        Yes, ma'am.  What did you want to tell me.

19        THE WITNESS:  Okay.  May I read it to you?  So I won't

20   babble.

21        THE COURT:  That's quite all right.  However you want

22   to do it.

23        THE WITNESS:  I'm considered Jay's Florida mom.  His

24   family lives in Virginia, so I am happy that I could fill that

25   role.

1            My family and I got to know Jay, his son Nick, and

2    Nick's mom three years ago.  They started coming to our church

3    and we got involved with them.  I've been visiting Jay almost

4    weekly for the past year.  My husband and sons, who are 20 and

5    25, have also visited Jay.  Without a doubt, I've seen a

6    difference in Jay through this year.  He has matured and grown

7    in wisdom.  I attest that to his growing intimate relationship

8    with God.  He loves God and he knows that God has forgiven him

9    and that he is a changed man.

10           He not only reads his Bible daily, he studies and

11   applies what he has read.  We have weekly Bible studies and he

12   tells me and explains to me what he's read and learned, and he's

13   also been encouraging other people in the jail.  And I have a

14   ministry where I get to send Bibles and Christian books, and

15   I've sent some to the people that he's encouraged.

16           And he also has memorized scriptures.  And the neat

17   thing about that was when he was in Vero, he had memorized

18   scriptures and then when he was moved to Fort Pierce, he wasn't

19   able to bring his Bible with him, and he found himself reciting

20   the scriptures as comfort.  And I quiz him on them also to make

21   sure that he has really memorized them. He's also read many

22   Christian books and we discussed those to help him become a

23   better person.

24           And he's also taught me things.  When I come see him

25   almost weekly, his attitude is very good.  Even though he's not

1    happy, but he has the joy of the Lord.  And it's not something

2    that I don't think can be faked.

3         He could have been wasting his time watching TV, but

4    instead he's been studying and reading these books and taking

5    notes and trying to become a better person and the person that

6    God created him to be.

7         His son, Nick, is an adorable three-and-a-half year old

8    smart little boy.  He looks like the little boy in Home Alone, I

9    forget the actor's name, but he looks just like that.  And about

10   a month ago, Nick, his little boy, Nicholas, was sitting at my

11   counter and he just put his head on his hand and just said "I

12   miss my daddy every day".  And, you know, of course that was

13   very sad.

14        There's a strong bond between Nick and his dad.  And

15   Jay used to bring Nick over to our house and I remember one time

16   they came and they both had Miami Dolphin hats on.  Then another

17   time he bought Nick this little golf bag and they were starting

18   to golf together.  And they both have spent the night at our

19   house several times and have been at our house numerous times.

20   But Jay would always get on the ground and play cars or castle

21   man with Nick, and he would go outside and play ball with Nick.

22   And I only, only saw good in Jay, and he's is great father.  But

23   most of all, he showed Nick lots and lots of love.  He

24   disciplined him if he needed it, but he showed him lots of love.

25

1          So anyway, sir, I believe with all my heart that Jay is

2     a different person than he was a year ago.  I saw him change

3     weekly.  And I really believe that he has matured and he could

4     be a very productive member of society.  And I know his son

5     needs him in his life and so I ask and pray that you show mercy

6     on this decision regarding Jay's sentencing.

7          Thank you for your time.

8          THE COURT:  Thank you very much.

9          MS. AUGUSTIN-BIRCH:  Next, Your Honor, is Mr. Nagel's

10    father, Jason Nagel.

11         THE COURT:  Yes, sir.  What would you like to tell me?

12         THE WITNESS:  First of all, I'm a little nervous.  I

13    didn't write anything down.

14         THE COURT:  That's quite all right.  Don't worry about

15    that.

16         THE WITNESS:  What Bonnie just read is all true.  Jay

17    is just a very good person.  And growing up, well, he played

18    sports in high school and he was a big sports star.  And I know

19    he started sexual activity at a young age.  And I knew it back

20    then, but I just thought, you know, boys will be boys, kind of a

21    thing back then.  And I didn't realize how serious of a problem

22    that is, a young person like that engaging in sex.  And I wish

23    -- I feel like I failed him.  I wish I had done something back

24    then.  Because I know he just grew up thinking that it was okay.

25    I don't want to say the wrong things, but I feel very bad for

1    the girls that are involved and I feel like they're in the same

2    situation he was back at their age, you know.  Involved in

3    things that are way beyond their capability of handling.

4            Sex is an adult thing and it's not for children.  Jay

5    would never hurt a child intentionally.  I know if he had time

6    to think about what he was doing, we wouldn't even be here right

7    now.  But obviously he was in a different place and wasn't

8    thinking about the consequences for everybody.  I know if given

9    a chance, he would help these girls rather than contributing to

10   their problem.  Because any teenager that's having sex, there's

11   issues underlying issues, there's problems there.

12           Your Honor, I believe God has put this in your hands.

13   I just I beg you to show my son some mercy.  If anybody has ever

14   deserved a second chance, it's Jay.  He was a great dad and now

15   after going through this, I know he's going to be even that much

16   better of a father.  I know Jay knows what he did was wrong, I

17   know that Jay would never do -- this would never happen again.

18   But I beg you to be as lenient as you possibly can with Jay.  If

19   you've ever been lenient with anybody,  please, Jay, is the --

20   Jay deserves that.  I believe that with all my heart, Jay

21   deserves that.  He made a bad, bad mistake.       Like I said

22   before, sexual addiction, whatever, porn, all these things that

23   society has, the sex everywhere, it's like a cancer.  And once

24   you get in it, you make bad decisions.  And I feel like Jay was

25   still thinking like a teenager.  He never got out of that.  He

1    needed help back when he was young and he didn't get it, until

2    something like this happened.  I just wish he had a chance to

3    get help now instead of his son growing up without a father.

4         I mean, it's just -- I just don't feel like any harsher

5    of a sentence is going to help things at all.  I feel like if

6    the victims in this case are seeking justice, I think that

7    justice has already been served. Jay's life will never be the

8    same.  His son's life will be never be the same.  His family's

9    life will never be the same.  And Jay's the kind of guy, like I

10   feel like if he had the opportunity now, he would probably

11   dedicate his life to do what he can to make sure things like

12   that never happen.  You know, I think that he would share his

13   story and his experiences with others that are going through the

14   same kind of circumstances and, you know, show them where that

15   leads to.

16        THE COURT:  Thank you, sir.

17        THE WITNESS:  All right.  Thank you, Your Honor.

18        MS. AUGUSTIN-BIRCH:  Next we have his mother, Elizabeth

19   Nagel.

20        THE COURT:  Good afternoon.  What did you want to tell

21   me, ma'am?

22        THE WITNESS:  I just want to speak a little bit of the

23   Jay I know, that I've raised, and I love with all my heart.

24        He is an amazing son.  He's always been a strong hold

25   in our family.  Being the older brother, he's always looked out

1    for his brother and sister, taken care of them when we weren't

2    there.  And everyone just loves and cares so much.  He's always

3    been one to help everybody.

4          Going through school, he was always the encourager.

5    You know, he didn't make fun of anybody.  He didn't take part in

6    it.  If somebody needed something, he was there for them.  He

7    just always really cared about everybody.  Never negative.  Just

8    positive all the time.  And a smile.

9          He's been a joy in my life.  Raising him and seeing him

10   grow into a young man and having a son of his own, and watching

11   him enjoy his own son and love him so much and care for him, and

12   work hard and do everything he can for his son. And, you know,

13   his family would do anything for us.  There's never anything bad

14   has ever come out of him.

15         I took some notes to try to keep my head together on

16   this one.  I do know since he's gone in, was arrested, it was a

17   lot for everybody to take in.  It definitely was a shock.

18   Nobody ever saw this coming.  Not like -- you know, not this.

19   And I don't think anybody would ever condone his behavior, but

20   anybody that knows him or has gotten to know him knows that this

21   wasn't his normal character.  And over the year talking to him

22   on the phone, writing letters, you know, I would hear from him

23   once, twice, maybe three times a week.  I've just seen him

24   actually become more positive, more mature about situations.

25   There's never "woe is me", you know, "look at me in my

1    situation".  He's always "how are you doing today". "How is your

2    job going.  How is Darian", his sister, "how is Justin", my

3    brother.  He's always concerned with what's going on with

4    somebody else.  Just the most positive outlook.

5         And with dealing with the bleak situation that he's put

6    himself in, he's just -- I mean, his -- you know, he talks about

7    God, he tells me about the books he's reading that Bonnie sends

8    him, and praying.  He's even told me about mentoring other

9    inmates that come in.  Using what he's going through and what

10   he's learned to help others.  I know, like I say, I've seen him

11   change.  Not that he's ever been a bad person or shown a bad

12   heart, he's just he's grown ever more.  When he calls, it's like

13   he's -- like you can see his smile through his voice and it's

14   just -- it's like he's not even there.  He's just dealing with

15   the situation and knowing what's going on and taking it from

16   there.

17        I know from just talking to him, he's accepted, you

18   know, and knows what he's done.  And knows that he needs to just

19   -- he needs to move forward.  And I know him and I know he's

20   going to take whatever comes with this sentencing and he will do

21   what he can to help anybody he's with.  Whether it's, you know,

22   inside or outside, in jail or outside jail.  I know he's going

23   to use this as a positive to try to help other people.  Like I

24   say, I already know he has.  He's talked with other inmates and

25   helped them, you know, with knowing that, you know, he is going

1    to -- I mean, he is going to get a sentencing, you know.  He's

2    going to go to jail.  To prison.  Just, I hope and pray that his

3    sentencing matches him, his heart.  I don't want him to be away

4    for 30 years.  I know inside me I don't feel like he deserves

5    that.

6          And I just pray that he -- and I have every day, that

7    you know -- I know it's not going to go away.  So I just pray

8    that it's going to be less than the maximum.  And I want him to

9    have some kind of life with his son, my grandson.  And I know

10   that would be good for both of them.

11         THE COURT:  Thank you, ma'am.

12         THE WITNESS:  Yeah, I'm just -- okay.

13         THE COURT:  Thank you.

14         MS. AUGUSTIN-BIRCH:  Your Honor, Mr. Nagel is going to

15   address the court.

16         THE COURT:  All right.  You can stay seated.  It's

17   easier to speak into the microphone if you're seated.  Marshal

18   will pull it over.

19         Yes, sir.

20         THE DEFENDANT:  I wrote it all down because I know I'm

21   a little nervous speaking here in court today, so I'll go ahead

22   and read from it.

23         Since I can remember, sex has been everywhere.  In

24   movies, TV, magazines and today's fashions.  I've always heard

25   that sex sells, which it does.  But it also destroys lives.  I

1   fell into that trap and it has taken this circumstance to

2   realize it.

3          Ever since my family first got Internet when I was

4   about 13, I would find time to look at adult porn.  It started

5   out as casual, but it quickly became an addiction.  It became an

6   addiction, but I never admitted that I had a problem to anyone,

7   including myself.  It took the mother of my son to really bring

8   the problem to light, which at that time she had threatened to

9   leave me.  That was the first time and the last time I went a

10  few months without it in my life.  Still, I never got help for

11  it and would go to it any time I felt lost and alone during bad

12  days in my relationship, or just when I had a bad day to myself.

13  It was a habit I couldn't break and hampered any relationship I

14  had with God or any significant other that I would try to build.

15         The situation that I'm in now, I feel strongly that it

16  stemmed from that addiction.  When I created the Facebook

17  account under a false name, it was to hide it from my girlfriend

18  at the time.  I never meant for it or thought that it would hurt

19  anyone else.  At the time, I'm very confident that I was

20  depressed and not in a stable state of mind.  I seriously, at

21  the time, lived two separate lives and that is something I never

22  thought I would do.  In looking back, I still don't understand

23  it.  I had two different personalities battling inside of me.  I

24  never once thought about consequences, let alone that I was even

25  doing anything wrong.         When I was on that Facebook account

1   being the other person, I was 100 percent in the mind frame that

2   was back in high school again.  Everything about that account

3   shows that the way I talked was like I was 16 again.  So were my

4   actions. It was like I was living deja vu.  In no way am I

5   trying to justify my actions.  What I did was wrong, and I have

6   asked God for forgiveness through true repentance and truly am

7   sorry for what I've done.

8       One thing I never realized until the ample amount of

9   time I've had in jail to think is how my actions didn't just

10   affect myself, but anyone that is connected to me as well.  My

11   son is going a full year now without me as his father, and it

12   breaks my heart to know that he asks about me.  I've let him

13   down.

14       To his mother, I left her a single parent without the

15   support I can give.  That's not easy and I'm thankful.  She's a

16   great mother and a strong woman.

17       My parents, who did not raise me to break the law.

18   They did a wonderful job, whether it shows or not.

19       I'm sorry to the victims an their families for putting

20   them through this.  I can't imagine what they're going through

21   and I feel terrible for the pain I've put them through. I asked

22   for forgiveness from them, and only pray that someday they will.

23       I know the things I've done carry heavy consequences

24   and that I will be punished for them and I deserve the

25   punishment.  All I can ask is for leniency, Your Honor.  I know

1   I need help in certain areas and will seek all the help I can

2   receive.  I know the crimes I committed can label me a danger to

3   society, but I truly am not.  Everyone makes mistakes to varying

4   degrees, and I know mine are serious.  But I've been working

5   this past year to correct my mistakes and change my way of

6   thinking entirely.  I really have made extraordinary progress

7   with the help from God.  There is wrath and punishment in God,

8   but there's also forgiveness, grace and mercy and those are

9   wonderful gifts I thank him for every day.

10       My son is three, and I love him so much and I want to

11  be there for part of his adolescence.  I know I can be a

12  contributing citizen to society again and ask that you see the

13  sincerity in my goal to be better and do better.  I will use all

14  resources available to me to fix my wrongs and better myself and

15  come out of this situation a better man with the knowledge to

16  help other people to avoid these situations like mine, or come

17  out better themselves.  I ask you to please give me these

18  opportunities by granting me a lesser sentence.  There are

19  success stories out there, and I want to be the next, so  please

20  have that faith in me.

21       I thank you for giving me this time to speak and God

22  bless.

23            THE COURT:  Thank you, sir.

24            Ms. Birch, do you have any comment that you would like

25  to make?  What do you believe is a fair sentence?

1       MS. AUGUSTIN-BIRCH:  Your Honor, I do believe a

2   sentence of no more than 15 years is appropriate in this case.

3   In state court, a charge of lewd and lascivious battery, the

4   maximum penalty for that is 15 years.  So that is my --

5       THE COURT:  Come on.  State court, this would be lost

6   and he probably would have walked out of the jail by now.

7       MS. AUGUSTIN-BIRCH:  I don't think so, Judge.

8       THE COURT:  I don't know.  How many people do we see on

9   a regular basis that have 17 state arrests and no -- you know,

10  no more than a year and a day in jail?

11      MS. AUGUSTIN-BIRCH:  We do see that a lot, Your Honor,

12  but not in these types of cases.

13      THE COURT:  No, that's true.

14      MS. AUGUSTIN-BIRCH:  I think we see that a lot in petit

15  thefts and drug cases and --

16      THE COURT:  The jails are full and they can't print

17  more money like the federal government can.

18      MS. AUGUSTIN-BIRCH:  I understand that, Your Honor.

19  But in looking at an appropriate sentence in this case, I submit

20  to the court that 235 to 293 months is too much for this case.

21  I gave the court --

22      THE COURT:  292 not 293.

23      MS. AUGUSTIN-BIRCH:  I'm sorry, 292.  I gave the court

24  some examples of other cases where the criminal conduct in those

25  cases was far more egregious than what you've here.

1        Yes, what Mr. Nagel did is very serious.  And he

2   realizes that and I believe that he sincerely realizes that.  I

3   know that Your Honor hears all the time "oh, I'm sorry for what

4   I did" and, et cetera and you know, "I won't do it again", but

5   in listening to his family members, in listening to his

6   grandmother who wrote a letter, his other friends, he has

7   support here from his family and friends and the people from his

8   church.  And in listening to him and what he said to you, I do

9   believe that Mr. Nagel is very sorry for what he did and he

10  knows what he did is wrong.

11        And a reason why the court should consider a variance

12  in this case -- you know, this is not the type of situation

13  where Mr. Nagel was videotaping himself and the teenaged girls

14  when he was having sex and trying to sell it on the Internet and

15  trade with other people on the Internet. I showed some of those

16  examples to the court, and in those types of charges, it was

17  charged under the same statute and they received -- one person

18  received a sentence of 135 months, and the other person, I

19  believe, was a sentence of 204 months.  And I brought those

20  examples to the court because in looking at unwarranted

21  disparities, an appropriate sentence in this case, I submit to

22  the court, is -- 235 months is too much time based on all of the

23  3553 factors.

24        I understand that the Sentencing Commission put these

25  guidelines in place for a reason, but we also have to look at

1    each case on a case by case basis.  And in looking at his case

2    individually, I do think that the factors here, all of the 3553

3    factors, warrant a lesser sentence.

4            THE COURT:  Thank you, ma'am.

5            MS. AUGUSTIN-BIRCH:  Thank you.

6            THE COURT:  Government?  What's your position?

7            MR. BUTLER:  Yes, Your Honor.  We addressed all of the

8    section 3553 factors in our response to the motion for variance.

9    I don't want to repeat those here today.

10           But in looking at the facts of this case, in looking at

11    just what this defendant did, his own actions, this is not the

12    sort of case that takes it out of the heartland such that the

13    advisory sentence is unreasonable or too harsh.  There's a

14    reason why those enhancements apply to this defendant.  It's

15    because he did those things.  And that's why his range is where

16    it is.

17           There are some facts that we alleged in our response,

18    Your Honor, that we would like to present some testimony on

19    because they weren't part of the stipulation of facts for the

20    plea, and they were not contained in the presentence

21    investigation. The lead investigator is here today if we could

22    present some brief testimony?

23            THE COURT:  Very brief.  Go ahead.

24            MR. BUTLER:  We would like to call Detective Jeremy

25    Sheppard.

1          THE COURT:  All right.   Please come forward Detective

2   Sheppard.

3          THE COURT:  Over here.   Please remain standing, when

4   you reach here and raise your right hand.

5          JEREMY SHEPPARD, GOVERNMENT WITNESS, SWORN

6          THE COURT:  All right, sir.  Please tell us your name.

7          THE WITNESS:  Jeremy Sheppard.

8          THE COURT:  You may proceed.

9                        DIRECT EXAMINATION

10   BY MR. BUTLER:

11   Q.  Detective Sheppard, when you examined the defendant's

12   Facebook instant messaging record between November 2013 and July

13   2014, were you able to determine how many females under the age

14   of 18 he had been communicating with?

15   A.  There were approximately 18 females under the age of 18.

16   Q.  Did you notice any common theme about his communications

17   with these underage girls?

18   A.  When he was speaking with them, he would talk to them about

19   trying to meet up with them.

20   Q.  Were these communications, without the content, put on a

21   spreadsheet for ease of examining the pattern of activity?

22   A.  Yes.

23          MR. BUTLER:  Judge, I have an exhibit which I would

24   like to offer for demonstrative purposes as Government's Exhibit

25   1.

1        MS. AUGUSTIN-BIRCH:  I've seen it already, Your Honor.

2        THE COURT:  Yes, you may. Demonstrative Exhibit 1.

3        (Government's Exhibit 1 in evidence)

4    BY MR. BUTLER:

5    Q.   Detective Sheppard, in looking at October 2013, we only see

6    one communication?

7    A.   Correct.

8    Q.   What happens in November?

9    A.   In November of 2013, the communications were greater.

10   Q.   And how many individuals was he communicating with in

11   November 2013?

12   A.   With four different females.

13   Q.   And how many different communications -- were you able to

14   add up the number of messages he was either sending or receiving

15   for that month?

16   A.   Yes.

17   Q.   That was?

18   A.   That was 559.

19   Q.   Of those individuals, how many were under the age of 18?

20   A.   Two.

21   Q.   What happened the next month in December of 2013?

22   A.   In the next month, it increased again.

23   Q.   And how many total communications did he engage in in

24   December of 2013?

25   A.   1,572.

1    Q.   And of those communications, how many of these females did

2    he talk to who were under the age of 18?

3    A.   Six.

4    Q.   If you skip forward to let's say April of 2014, how many

5    communications did he engage in in April of 2014?

6    A.   3,424.

7    Q.   And how many different females was he communicating with

8    during that month?

9    A.   16 females.

10   Q.   How many of those were under the age of 18?

11   A.   11.

12   Q.   In addition to the four underage females that we know about

13   that he engaged in sexual relations with, was there another

14   underage female that he talked to that had exchanged

15   pornographic pictures with him?

16   A.   Yes.

17   Q.   How old was she?

18   A.   She was 14.

19   Q.   Was she one of the ones he was also communicating with?

20   A.   Yes.

21   Q.   How was her involvement in this even brought to your

22   attention?

23   A.   It was brought to my attention by the youth pastor at both

24   Jay Nagel and the underage female went to.

25   Q.   And how did the youth pastor make this -- how was the youth

1    pastor aware of this?

2    A.   When Jay Nagel started showing up at the youth group

3    activities, the underage female recognized him and learned of

4    his real name and she started talking to other children in the

5    youth group about what happened between her and Jay Nagel, and

6    they then talked to the youth pastor's wife.

7    Q.   Had he been invited to take part in these youth group

8    activities?

9    A.   Not that I'm aware of.

10   Q.   And was he allowed to continue to take part of in these

11   activities?

12   A.   He was asked to not come back to the youth group again.

13   Q.   Did you notice any similarities among the four victims that

14   we know that he had sexual relations with?

15   A.   Yes.

16   Q.   Would you tell the court about the similarities?

17   A.   The four juvenile females that were victims all seemed to

18   have be emotionally troubled and have low self esteem.

19   Q.   And can you give any examples of that?

20   A.   Yes.  With the victim C.R., she was involved in cutting

21   herself.  She was going through learning that she was adopted,

22   as well as she had her brother who had a drug problem.

23   Q.   Did you see in the messages where she was actually talking

24   about these things online, on Facebook?

25   A.   Yes.  She was confiding in Jay Nagel about what was going on

 1    in her life.

 2    Q.   Did she ever know that his name was actually Jay Nagel?

 3    A.   No, she did not.

 4    Q.   You mentioned C.R.  What about M.B.?

 5    A.   With M.B., she was a high school dropout and her mother

 6    describes her as out of control with severe emotional problems.

 7    Q.   And A.L.?

 8    A.   With A.L., her father is in prison.  Her mom abandoned her.

 9    She's being raised by her grandmother, as well as I learned

10    during the investigation that her mother, when she was younger,

11    would have sex with men in front of her, as well as do different

12    drugs in front of her.

13    Q.   And S.E.?

14    A.   With S.E., she was abandoned by her parents and at the time

15    of the investigation, she was living with her mom's former

16    boyfriend.

17    Q.   Now, we've heard some testimony about the defendant being a

18    good father to his young son.  Did you uncover in your

19    investigation any role that he may have -- that the son may have

20    played in any of this activity?

21         In other words, did he use his son to help facilitate

22    any of this sexual activity with underage girls?

23    A.   Two of the older females that he had sex with, he talked to

24    them about his son, as well as introduced them to his son.  And

25    on different occasions that he had sex with them, he actually

1    had his son for visitation and spent time with these juvenile

2    females along with his son, and would then put his son to bed

3    and have sex with these underage females with his son in his --

4    in the son's bedroom, as well as one of the females talking

5    about smoking marijuana with Mr. Nagel while his son was at the

6    house.

7            MR. BUTLER:  Thank you.  I don't have any further

8    questions, Your Honor.

9            THE COURT:  Ms. Birch?

10           MS. AUGUSTIN-BIRCH:  Briefly.  Your Honor.

11           THE COURT:  Very.

12                         CROSS-EXAMINATION

13      BY MS. AUGUSTIN-BIRCH:

14   Q.  Good afternoon, Detective Sheppard.

15   A.  Good afternoon.

16   Q.  To your knowledge, all of the juveniles you refer to:  C.R.,

17   M.B., A.L. and S.E., Mr. Nagel met them through Facebook?

18   A.  As far as I know.

19   Q.  So as far as you know, that's how their relationship began,

20   over Facebook?  Was through Facebook?

21   A.  Correct.

22   Q.  Okay.  And is it correct that both the juveniles and

23   Mr. Nagel were both involved in the conversations involving sex.

24   A.  Yes, both of them were involved in the conversations.

25   Q.  Now, you refer to two of the older females that were present

1    at Mr. Nagel's home when he had sex with them.  It was two

2    females that you referred to, correct?

3    A.  Correct.

4    Q.  And your investigation revealed that the son was sleeping

5    while he was having sex with the older females; is that correct?

6    A.  Yes.

7        MS. AUGUSTIN-BIRCH:  I have nothing further, Your

8    Honor.

9        THE COURT:  Thank you, ma'am.  All right, sir.  Thank

10   you very much.  You're excused.

11       Anything further, sir.

12       MR. BUTLER:  No further testimony, Your Honor.  We did

13   file a letter from one of the victim's mother with the --

14       THE COURT:  I read it.

15       MR. BUTLER:  With the court.

16       THE COURT:  Tell me what you want.

17       MR. BUTLER:  We're seeking what is essentially a middle

18   of the advisory guideline sentence, it's actually a little less

19   than that, 324 months.  We believe that's an appropriate and

20   reasonable sentence for this defendant given his actions, his

21   activities.

22       This is not a case, Your Honor, where he simply gave in

23   to the emotion of an inappropriate relationship.  This involves

24   heightened premeditation.  He had to specifically go online and

25   create the fake identity, the fake Facebook account.  He then

1    used that to -- what appears to be essentially a targeting, a

2    predatory behavior in targeting underage females, and it seemed

3    almost to be a game to him the way that he would manipulate

4    these children.

5        You see an extended pattern of manipulation.  He

6    manipulated C.R. for a five month period of time before he

7    actually gained enough trust from this 13-year-old to engage in

8    sexual relations with her. This takes a certain level of cunning

9    and patience and manipulation, and given all of the factors that

10   we've outlined, Your Honor, in our response to the motion for

11   variance, we believe that a two hundred -- I'm sorry, a 324

12   month sentence is eminently appropriate for this defendant's

13   behavior.

14       THE COURT:  All right, sir.

15       Anything further from either side?

16       MS. AUGUSTIN-BIRCH:  May I have a moment, Your Honor?

17       THE COURT:  Sure.

18       MS. AUGUSTIN-BIRCH:  Nothing else, Your Honor.

19       THE COURT:  All right.

20       I've considered all the matters that I discussed

21   before, including the testimony that I received today, and the

22   evidence that was received during this hearing.

23       I've considered the statements of all the parties, the

24   presentence report which contains the advisory guidelines and

25   the statutory factors as set forth in 18 USC section 3553.

1          A sentence will be imposed within and at the low end of

2     the advisory guideline range, as I believe this will provide

3     sufficient punishment and deterrence.

4          It is the finding of the court the defendant is not

5     able to pay a fine; however, restitution is mandatory.

6          It is the judgment of the court the defendant, Jay

7     Frederick Nagel, is committed to the Bureau of Prisons to be

8     imprisoned for 292 months.  This term consists of 292 months as

9     to each of Counts 1, 2 and 3 to be served concurrently.

10         It is further ordered the defendant shall pay

11    restitution in the amount of $400.

12         During the period of incarceration, payment shall be

13    made as follows:  If the defendant earns wages in a Federal

14    Prison Industries UNICOR job, then the defendant must pay 50

15    percent of wages earned toward the financial obligations imposed

16    by this judgment in a criminal case.  If the defendant does not

17    work in a UNICOR job, then the defendant must pay a minimum of

18    $25 per quarter towards the financial obligations imposed in

19    this order.

20         Upon release from incarceration, the defendant shall

21    pay restitution at the rate of 10 percent of monthly gross

22    earnings until such time as the court may alter that payment

23    schedule in the interests of justice.  The US Bureau of Prisons,

24    US Probation Office and US Attorney's Office shall monitor the

25    payment of restitution and report to the Court any material

change in the defendant's ability to pay. These payments do not

preclude the government from using any other anticipated or

unexpected financial gains, assets or income of the defendant to

satisfy the restitution obligations.  The restitution shall be

made payable to clerk, United States Courts and forwarded to US

Clerk's Office, attention Financial Section, 400 North Miami

Avenue, Room 8N09, Miami, Florida, 33128.  The restitution will

be forward by the clerk of the court to the victim on the

attached list.

Upon release from imprisonment, the defendant shall be

placed on supervised release for a term of 20 years.  This term

consists of 20 years as to Counts 1, 2 and 3, all such terms to

run concurrently.

Within 72 hours of release from custody of the Bureau

of Prisons, the defendant shall report in person to the

probation office in the district to which the defendant is

released. While on supervised release, the defendant shall not

commit any crimes, shall be prohibited from possessing a firearm

or other dangerous device, shall not possess a controlled

substance, shall cooperate in the collection of DNA and shall

comply with the standard conditions of supervised release

including the following special conditions:

Data encryption restriction, computer possession

restriction, employer computer restriction disclosure, substance

abuse treatment, no contact with minors, no involvement in youth

1    organizations, sex offender treatment, restriction from

2    possession of sexual materials, Adam Walsh Act search condition

3    and sex offender registration as noted in part G of the

4    presentence report.

5         It is further ordered the defendant shall pay

6    immediately to the United States a special assessment of $100 as

7    to each of Counts 1, 2 and 3 for a total of $300.

8         The total sentence: 292 months imprisonment, $400

9    restitution, 20 years supervised release, and $300 special

10   assessment.

11        Now that sentence has been imposed, does the defendant

12   or his counsel object to the court's finding of fact or the

13   manner in which sentence was pronounced?

14        MS. AUGUSTIN-BIRCH:  Your Honor, as regarding the

15   objections that I filed to the PSI, we would renew them at this

16   time.

17        THE COURT:  All right.  I'll renew my rulings.

18        MS. AUGUSTIN-BIRCH:  And we would also object to the

19   reasonableness of the sentence.

20        THE COURT:  Very well.  All right.  You have the right

21   to appeal the sentence imposed.  Any notice of appeal must be

22   filed within 14 days after the entry of the judgment.  If you're

23   unable to pay the cost of an appeal, you may apply for leave to

24   appeal in forma pauperis.

25        Good luck to you, sir.

```
 1              Are there additional counts to be dismissed?

 2              MR. BUTLER:  There are not, Judge.  I believe there is

 3    a 10 year minimum mandatory on each count.  I may have misheard

 4    the court.

 5              THE COURT:  But I gave him 20.  I mean, I gave him 24,

 6    didn't I?  On each count?

 7              MR. BUTLER:  Yes, I believe that you also have to

 8    impose -- note that there is a 10 year minimum as to each count.

 9              THE COURT:  I don't think so.  No, it's done.  Only if

10    I gave him less than ten years, then -- but I don't think I do.

11    But if I do, they'll tell me.  They're not shy about telling me

12    I screwed up.

13              I will put into the official order that I recommend

14    that he be incarcerated in a facility in Virginia, if that is

15    commensurate with his background and the offense of which he

16    stands convicted.  All right?

17              We'll be in recess on this case.

18              (PROCEEDINGS CONCLUDED)
                               * * * * *
19
                         C E R T I F I C A T E
20    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
21
      10-19-2015          /s/ Dawn M. Whitmarsh
22    Date                DAWN M. WHITMARSH, RPR

23                         I N D E X

24                         WITNESSES

25    All Witnesses:                                        Page
```

44

```
 1    Jeremy Sheppard for Government
       Direct Examination by Mr. Butler                32:19
 2     Cross-Examination by Ms. Augustin-Birch         37:23

 3                          EXHIBITS

 4    1
       In Evidence                                     33:14
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```